IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DAWN CARTER, et al., | : | Case No. 1:05-CV-163 |
| | : | |
| Plaintiffs, | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING |
| | : | DEFENDANTS' MOTION TO |
| COLERAIN TOWNSHIP, et al., | : | STRIKE PLAINTIFFS' EXHIBIT |
| | : | AND GRANTING IN PART AND |
| Defendants. | : | DENYING IN PART |
| | : | DEFENDANTS' MOTION FOR |
| | : | SUMMARY JUDGMENT |

This matter is before the Court on Defendants' Motion for Summary Judgment (doc. 10) and Motion to Strike Plaintiffs' Exhibit (doc. 30). On March 15, 2005, Plaintiffs Dawn Carter, George Carter, and Calonda Balleau filed suit against Defendants Colerain Township; Colerain Township Trustees Keith N. Corman, Bernard A. Friedley, and Dianna Lynn Rielage; Colerain Chief of Police Steven J. Sarver; and Colerain Township Police Officers Mark Denney, Kevin Sevier, and Justin Hussel.[1] (Doc. 1.) Though somewhat unclear, Plaintiffs' complaint appears to assert claims for false arrest, excessive force, conspiracy, and failure to train and/or supervise pursuant to 42 U.S.C. §§ 1983 and 1985. Plaintiffs also assert state law claims for assault, battery, and negligence.

Defendants moved for summary judgment on all of Plaintiffs' claims. (Doc. 10.) Plaintiffs oppose Defendants' motion. (Doc. 24.) For the reasons that follow, the Court

---

[1] Plaintiffs sue all named Defendants in their official and individual capacities.

1

**GRANTS** Defendants' Motion to Strike and **GRANTS** in part and **DENIES** in part Defendants'

Motion for Summary Judgment.

## I.     BACKGROUND

On March 15, 2004, Colerain Township Police Officers Mark Denney, Kevin Sevier, and

Justin Hussel were dispatched to the house of George Carter and Calonda Balleau[2] to investigate

a possible domestic dispute.  The dispute began when a toilet, sink, and bathtub in a bathroom on

the lower level of George Carter's house overflowed.[3]  (George Carter Dep. 27-28.)   George

Carter panicked because he had recently installed a new hardwood floor in the kitchen next to

the bathroom and did not want the floor to be destroyed.  (Id. at 27:16-20.)  He asked his wife,

Balleau, who was cooking dinner in the kitchen, to get him a mop and bucket.  Balleau, in turn,

asked Carter's sister, Dawn Carter, to bring the mop.  (Id. at 27:12-15.)  Seeing this as an

indication that Balleau did not appreciate the seriousness of the overflow, George Carter became

agitated and began to yell at Balleau.  (Id. at 28:17-30:23.)

Complicating matters further was the fact the George Carter suffers from bipolar disorder

and had not taken his medicine that day.  When he started yelling at her, Balleau threatened to

call the police or the paramedics to make him take the medicine.  Balleau had successfully used

this tactic two or three times in the past.  (Balleau Dep. at 20:7-21.)  On this occasion, Balleau

called 911, but claims she merely asked for a non-emergency number that she could call in the

---

[2] In their complaint, Plaintiffs refer to Calonda as "Calonda Balleau."  Elsewhere the
parties occasionally refer to her as "Calonda Balleau Carter" and "Calonda Carter."

[3] Carter and Balleau's bi-level house was designed such that the front door opens into a
foyer with approximately four stairs leading to the lower level.  The bathroom in which the toilet
was overflowing was located on the lower level, along with a kitchen, a family room, and a
dining room.  (See Balleau Dep. 31:19-32:15; Sevier Dep. 32:17-18, 37:1-6.)

2

event that a problem developed with her husband.  (Id. at 20:22-21:5.)  According to George

Carter, he grew angrier when Balleau called 911 rather than help him with the toilet.  (George

Carter Dep. 35:21-36:4.)  As a result, while Balleau was on the phone with the 911 operator,

George Carter continued to yell at her and eventually knocked the phone out of her hands.

(Balleau Dep. at 29:2-31:15; George Carter Dep. 35:21-36:4.)

Though Balleau allegedly told the 911 operator that she did not need assistance, the

operator sent out a dispatch, requesting officers to investigate a possible domestic dispute.  (See

Denney Dep. 31:23-32:7, 32:25-33:4, 36:6-9; Sevier Dep. 11:1-23; Hussel Dep. 15:13-16.)

Officers Denney, Sevier, and Hussel responded to the call.  They maintain that the dispatcher did

not inform them that George Carter was mentally ill.  Nor were the officers aware that Dawn

Carter suffers from multiple sclerosis.  According to the officers, they did not learn of the

Carters' respective conditions until after arresting them.

Beginning at the point the officers arrived on the scene, the parties' accounts of the

evening diverge.  Officers Denney and Sevier arrived first on the scene.  Both officers claim that

George Carter, who was standing on the porch when they approached, yelled something along

the lines of "Yeah, right here, and bring your zappers with you," and then retreated into the

house.  (Sevier Dep. 29:13-22, 30:19-24; Denney Dep. 34:3-16.)  The officers knocked on the

door and could hear people yelling inside, but received no response.  (Sevier Dep. 31:18-32:15;

Denney Dep. 35:9-14.)  Officer Denney stated that he saw neighbors standing outside and

believed they heard the yelling.  (Denney Dep. at 58:19-59:11.)

After the officers had knocked a few times, they cracked the door open, shouted hello,

and identified themselves as police officers.  (Sevier Dep. 32:13-18; Denney Dep. 35:22-36:1.)

3

At that point, Balleau appeared and told the officers to come in.  (Sevier Dep. 32:19-33:19; Denney Dep. 36:2-5.)  When the officers entered the house, George Carter yelled to the officers to get out of his house.  (Sevier Dep. 32:19-33:19; Denney Dep. 36:2-5.)  Still standing in the entryway, the officers observed George Carter pacing back and forth on the lower level.  (Sevier Dep. 36:10-25.)

The officers claim that after they unsuccessfully attempted to calm George Carter down, he suddenly ran up the stairs towards them with his fists clenched, stating that he had just gotten out of prison, was on parole, and was not going back.  (See Sevier Dep. 41:1-22; Denney Dep. 42:21-23, 45:7-8.)  At that point, Officer Denney drew his taser gun and George Carter stopped and told Officer Denney to go ahead and shoot him. (Sevier Dep. 42:1-16, 44:4-6; Denney Dep. 45:7-8.)  Once again, Balleau tried to calm George Carter down, but he continued to act belligerently and retreated to the lower level, out of the officers' sight.  (Sevier Dep. 44:6-8, 45:3-7.)

By that time, Officer Hussel had arrived, and he followed Officer Denney down to the lower level to locate George Carter while Officer Sevier stayed with Balleau upstairs to try to ascertain what had caused the dispute.  (Id. at 46:5-16; Hussel Dep. 26:1-2.)  Upon reaching the lower level, the officers saw both George and Dawn Carter.  Officer Denney, with his taser still drawn, told George Carter that he was under arrest and ordered him to turn around and put his hands behind his back.  (Denney Dep. 69:13-20.)  Refusing to comply, George Carter held his hands in the air and continued to tell Officer Denney to "go on and shoot."  (George Carter Dep. 44:2-8.)  Dawn Carter then stepped in front of George Carter and told Officer Denney that he was "not going to tase her brother."  (Id. at 44:9-10; Dawn Carter Dep. 40:7-10.)  Officer

Denney advised Dawn Carter that he would arrest her for obstruction of official business if she did not move. (Dawn Carter Dep. 41:24-42:6.)

Dawn Carter refused to move, and according to Officer Denney, George Carter backed up against the wall and squared off in a fighting stance toward him. (Denney Dep. 72:5-9, 123:18-19.) Believing that to be a threat, Officer Denney stepped around Dawn Carter and stunned George Carter by placing the taser up to his neck.[4] (George Carter Dep. 51:15-17, 53:20-23; Denney Dep. 71:17-72:9; Hussel De. 48:6-49:17.) George Carter fell to the ground and while Officer Denney tried to secure him, Dawn Carter started kicking and flailing her arms, striking Officer Denney in the head. (Denney Dep. 71:3-12.) Officer Denney then stunned Dawn Carter by touching the taser gun to her groin area. (Id. at 128:19-129:24.) Defendants maintain that Officer Denney only stunned Dawn Carter one time without using a taser cartridge. This assertion is supported by Officer Denney's taser addendum, which shows his taser being fired only twice on the night in question.[5] (Grayson Dep. 95:23-24; Rose Aff. ¶ 17, ex. 4.)

Dawn Carter began to hyperventilate after being tased. (Hussel Dep. 149:18-24.) While Officers Denney and Hussel tried to calm her down, Officer Sevier placed George Carter into handcuffs and walked him outside to Officer Hussel's patrol car. (Sevier Dep. 50:13-23; Hussel

---

[4] The taser can be deployed in two ways: either with use of the probe cartridge or as a drive stun. When a taser is deployed with use of a cartridge, two probes resembling straightened fishing hooks shoot out of the gun and hook into the target, creating a conduit by which to transmit the electrical current. Using this method of deployment, an officer may fire at a target from a distance of up to twenty-one feet. An officer may alternatively remove the probe cartridge from the gun and deploy the taser using the drive stun technique, where the officer holds the taser against the target individual's skin or clothing. (Rose Aff. ¶ 13)

[5] As is standard, Officer Denney's taser contained a memory chip that recorded the date and time of each deployment. (Hussel Dep. 52:11-16.) Officer Denney's taser addendum shows data collected from that chip.

Dep. 138:7-11.)  Dawn Carter was then transported to Jewish Hospital.  (See Sevier Dep.

128:20-129:1.)

As indicated above, Plaintiffs' account of the evening differs with regard to several

significant points.  First, Plaintiffs deny that George Carter told Officers Denney and Sevier to

bring their "zappers" with them when they arrived on the scene.  According to George Carter,

the only thing he said to the officers when he saw them outside of his house was "I hope you all

brought some plungers."  (George Carter Dep. 31:16-19.)  Plaintiffs further claim that Officers

Denney and Sevier entered the house without permission and then were asked to leave.

However, to the extent the officers had permission to be in the house, Balleau admitted during

her deposition that when the officers arrived she waved them in, thus consenting to their

entrance.  (Balleau Dep. 32:23-33:2, 33:18-25.)  George Carter testified that once the officers

were inside he repeatedly told them to get out of his house, but there is no testimony from

Balleau that she told the officers to leave.  (George Carter Dep. 36:9-22.)  George Carter

additionally denies charging up the stairs towards Officers Denney and Sevier, testifying instead

that Officer Denney walked down the stairs with his taser drawn while Carter and Balleau were

still arguing and confronted him on the lower level of the house.  (George Carter Dep. 39-40;

Balleau Dep. 22:8-22.)

Plaintiffs' account of the interaction between Officer Denney and George Carter just

prior to the point when Officer Denney stunned George Carter does not substantially differ from

Defendants' account.  With regard to Dawn Carter, Plaintiffs claim that Officer Denney stunned

her repeatedly on several places on her body while Defendants maintain Officer Denney stunned

her only once.  Plaintiffs specifically allege that Officer Denney stunned Dawn Carter multiple

times without a cartridge, by pressing the taser gun against her vaginal area, arms, breasts, stomach and neck.[6] Then, Plaintiffs allege, Officer Denney stepped back and shot her with a taser cartridge. (Dawn Carter Dep. 47:10-17, 50:2-24; George carter Dep. 54:16-55:16, 57:5-19, 58:3-59:11). Dawn Carter claims that the shock aggravated her multiple sclerosis and caused her to have an "episode" or an "attack" that was characterized by pain and shaking. (Dawn Carter Dep. 48:8-18, 49:2-14.)

Balleau, who had apparently been watching the whole event, felt that Dawn Carter needed medical attention and wanted the officers to send her to Jewish Hospital. According to her, the officers had already handcuffed and intended to arrest Dawn Carter, but she called 911 and finally got connected to Sergeant Grayson, who told the responding officers to send Dawn Carter to the hospital. (Balleau Dep. 24:5-24.)

The officers ultimately arrested George Carter for disorderly conduct and resisting arrest and charged Dawn Carter with obstructing official business and resisting arrest. All charges against George and Dawn Carter were eventually dismissed. Plaintiffs subsequently filed the instant lawsuit.

---

[6] As stated above, Officer Denney's taser addendum showed that he deployed his taser only twice. However, the addendum is not conclusive evidence. When a taser is deployed the charge will last up to five seconds. After five seconds, an internal mechanism automatically stops the charge and the officer must pull the trigger again. If an officer tases someone by placing the taser directly against that person's skin rather than using a deployment cartridge it is possible for the officer to tase the person on one area of the person's body and then touch the taser to another area of the body within the five second duration of the charge. (See Hussel Dep. 52-55.) Thus, an officer could possibly tase someone several times despite only pulling the trigger once.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).  The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  The nonmoving party "must set forth specific facts showing there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Liberty Lobby, 477 U.S. at 249.  A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law."  Id. at 252.

In reviewing the evidence set forth by both the moving and non-moving parties, the Court must carefully review "those portions of the submitted evidence *designated* by" both parties. Guarino v. Brookfield Twp. Tr's., 980 F.2d 399, 410 (6th Cir. 1992) (emphasis added).

However, the Court will not "sua sponte comb the record from the partisan perspective of an advocate for the non-moving [or moving] party." Id.

### III.    ANALYSIS

#### A.    Motion to Strike

As an initial matter, Defendants move to strike Exhibit 1 to Plaintiffs' Response to Defendants' Motion for Summary Judgment, the journal entries from the Hamilton County, Ohio Municipal Court proceedings against George and Dawn Carter. Plaintiffs have not responded to Defendants' motion, and the time for doing so has long since passed. Accordingly, as Plaintiffs apparently are not in opposition, the Court grants Defendants' motion and strikes the Hamilton County journal entries. See S.D. Ohio Civ. R. 7.2(a)(2) ("Failure to file a memorandum in opposition may be cause for the Court to grant any Motion, other than one which would result directly in entry of final judgment or an award of attorney fees."); U.S. v. One Parcel Prop. Located at 3504 and 3506 Old Hydes Ferry Pike, Nashville, Davidson County, Tenn., No. 92-5248, 1992 WL 276779, at *1 (6th Cir. Oct. 7, 1992) (concluding "that the district court did not abuse its discretion in striking the response for failure to object to the motion to strike").

The Court additionally notes that even if it were to consider the journal entries, the Court finds that the documents in question do not aide Plaintiffs' case. Plaintiffs primarily rely on the journal entries to show that they were acquitted of all criminal charges in state court because Defendants lacked probable cause to arrest George and Dawn Carter. However, the journal entries do not show that the court dismissed the charges due to lack of probable cause. Instead, the entries merely note that the Court granted motions for acquittal as to both George and Dawn Carter pursuant to Rule 29 of the Ohio Rules of Criminal Procedure. Rule 29 states nothing

9

about probable cause.  Instead, it sets the procedural rules for raising a motion for judgment of

acquittal, stating as follows:

> The court on motion of a defendant or on its own motion, after the evidence on
> either side is closed, shall order the entry of a judgment of acquittal of one or
> more offenses charged in the indictment, information, or complaint, if the
> evidence is insufficient to sustain a conviction of such offense or offenses. The
> court may not reserve ruling on a motion for judgment of acquittal made at the
> close of the state's case.

Ohio R. Crim. P. 29(A).  Accordingly, the journal entries provide no indication as to the basis of

the Rule 29 acquittals in the Carters' Hamilton County cases and do not support Plaintiffs'

allegation that the Hamilton County Municipal Court found that the defendant officers lacked

probable cause to arrest the Carters.

> **B.**    **Section 1983 Claims**
>
> > **1.**    **Claims Against Colerain Township and Official Capacity Claims
> > Against the Named Defendants**

Moving now to the merits of Defendants' Motion for Summary Judgment, the Court first

addresses Plaintiffs' § 1983 claims against Colerain Township and all named Defendants in their

official capacities.  The Court construes all official capacity claims as claims against Colerain

Township.  See Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("As long as the government

entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects

other than name, to be treated as a suit against the entity."); Leach v. Shelby County Sheriff, 891

F.2d 1241, 1245 (6th Cir. 1989) ("A suit against an individual 'in his official capacity' has been

held to be essentially a suit directly against the local government unit and can result in that unit's

liability to respond to the injured party for his injuries.").

A city or municipality may be "liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989). Respondeat superior is not available as a theory of recovery under § 1983. Monell v. Dep't. of Soc. Servs., 436 U.S. 658, 691 (1978). Therefore, a plaintiff seeking to subject a city or municipality to § 1983 liability for the actions of its officers must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403 (1997). Plaintiffs may satisfy this requirement in several ways. First, they may show that some official policy of Colerain Township, "made by its lawmakers or by those whose edicts may fairly be said to represent official policy," was a "moving force" behind Defendants' alleged violation of Plaintiffs' constitutional rights. Monell, 436 U.S. at 694-95. Alternatively, Plaintiffs may show that the officers acted pursuant to some unofficial policy or custom that, while never "formally approved by an appropriate decisionmaker," is nevertheless "so widespread as to have the force of law." Brown, 520 U.S. at 404; see also Monell, 436 U.S. at 690-691.

Plaintiffs do not allege the existence of any official policy that resulted in a violation of Plaintiffs' rights. Instead, Plaintiffs allege a custom or practice of insufficient training and supervision that led to the defendant officers' false arrest of both George and Dawn Carter and the use of excessive force in violation of Plaintiffs' Fourth and Fourteenth Amendment rights. As the Sixth Circuit has long recognized, "there need not be a formal policy for there to be an unconstitutional custom that amounts to policy" for purposes of imposing liability under § 1983. Berry v. City of Detroit, 24 F.3d 1342, 1345 (6th Cir. 1994). Even relatively passive customs that contribute to constitutional violations, such as "inadequate training or supervision" of

employees, may fall within the ambit of § 1983. See Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2004). A plaintiff seeking to establish liability under an "unofficial policy or custom" theory must typically show more than a single instance of unconstitutional conduct. See, e.g., City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985).

With regard to Plaintiffs' claim of inadequate police training, they specifically allege that Defendants have a custom and practice of providing sub-par training, particularly with regard to dealing with individuals who are mentally ill. The Supreme Court has recognized that "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to *deliberate indifference* to the rights of persons with whom the police come into contact." Harris, 489 U.S. at 388 (emphasis added). To succeed on their failure to train or supervise claim, Plaintiffs must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of Colerain Township's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006).

Turning to the first prong, Plaintiffs offer no evidence that the defendant officers' training or supervision was inadequate for the tasks performed. According to Defendants, Officers Denney, Sevier, and Hussel are all Ohio Police Officer Training Academy certified officers and all receive annual in-service training as well as roll call training from the Colerain Township Police Department. (Denney Dep. 11-12; Sevier Dep. 7; Hussel Dep. 5-6; Sarver Dep. 152-54.)

Citing Officer Sevier's deposition testimony, Plaintiffs claim that "Officer Sevier plainly admitted that if his training had been sufficient, he would have been able to better distinguish the

12

parameters in which he should engage in situations such as the one that [occurred] here." (Doc. 24 at 7.)  In doing so, Plaintiffs completely misinterpret Officer Sevier's testimony.  The ten-page deposition passage that Plaintiffs cite focuses almost entirely on Officer Sevier's understanding of the Colerain Township Police Incident Report that Sergeant Grayson completed following the arrests of George and Dawn Carter.  (See Sevier Dep. 82-92.)  In all ten pages, Officer Sevier touches on training only once to tacitly agree that if he had more experience or training regarding the content of incident reports, he may be able to better understand them.[7]  (See Sevier Dep. 91:22-92:16.)  Officer Sevier's ability to fill out an incident report such as the one discussed in his deposition has nothing to do with his ability to "distinguish the parameters in which he should engage in situations such as the one that [occurred] here."  (See doc. 24 at 7.)  Accordingly, Officer Sevier's lack of training as to the meaning of certain categories on the pre-printed incident report form is entirely insignificant.

---

[7] Officer Sevier's testimony, in pertinent part, begins below with Officer Sevier answering a question as to why certain boxes on the pre-printed incident report were not checked:

|  |  |
|---|---|
| THE WITNESS: | Again, I don't know what, with each block, what exactly pre-attack, what all falls in to answer that. |
| BY MR. TILLAR: | |
| Q | As far as your training and your experience as a police officer, do you personally have a problem with those being blank? |
| THE WITNESS: | Again, I don't know with each section what as a supervisor they are supposed to, what criteria may fit for each of these answers.  So I don't want to answer that without knowing that. |
| BY MR. TILLAR: | |
| Q | If you had additional training, you might feel comfortable in answering that question? |
| THE WITNESS: | If I was a supervisor and filled these reports out more often, was more familiar with the report, I might. |

13

Plaintiffs next argue that the officers lack adequate training for dealing with individuals suffering from mental illness, and that had they had proper training the officers would have been able to ascertain that George Carter suffered from bipolar disorder upon arriving at the scene.  In support of this assertion, Plaintiffs cite portions of Officer Denney's deposition testimony regarding training that Hamilton County, Ohio Police Officers had to complete following an incident in which Cincinnati Police Officers fatally shot an individual who had just escaped from a psychiatric hospital ward.[8]  (See Denney Dep. 84:14.)  Officer Denney merely testified that he believed Colerain township Police Officers underwent that training, but that he was not working for Colerain Township at that time.  Without more, Officer Denney's testimony is not evidence of inadequate training.  Plaintiffs present no evidence as to the full scope of training Colerain Township Police Officers receive with regard to mental illness, nor any evidence suggesting that that training is insufficient.  Instead, Plaintiffs point to the defendant officers' testimony that they did not learn of George Carter's mental illness until after arresting him, arguing that had the officers been properly trained they would have been able to recognize Carter's condition earlier.  Again, Plaintiffs offer no evidence to support this assertion.

Even if the officers' deposition testimony supported Plaintiffs' allegation that the officers' training was insufficient, Plaintiffs present no evidence that the alleged deficiency in training resulted from Colerain Township's deliberate indifference.  The Sixth Circuit has stated that "[a] failure to train amounts to 'deliberate indifference' where state actors should have known, either because of a history of [constitutional rights] violations or because such likelihood

---

[8] Plaintiffs additionally cite a portion of Officers Denney's testimony regarding a United States Department of Justice Report.  (See Denney Dep. 85.)  Plaintiffs neither identify the report, nor provide any evidence or explanation of its significance.  Accordingly, the Court cannot ascertain its relevance to the instant case.

14

was obvious, that [constitutional rights] violations were likely to result absent better training." League of Women Voters of Ohio v. Blackwell, 432 F. Supp. 2d 723, 729 (N.D. Ohio 2005) (citing Harris, 489 U.S. at 390, 390 n. 4).  Plaintiffs do not identify any specific problem that could be characterized as so obvious that failure to provide training as the that problem amounts to deliberate indifference.  Moreover, even if Plaintiffs had identified such a problem, they provide no evidence that Colerain Township did not in fact train its police officers to deal with such a problem.

Neither do Plaintiffs present evidence that Colerain Township was on notice of a history of problems related to false arrest and excessive use of force such as are alleged to have occurred in this case.  Instead, Plaintiffs offer only conclusory statements, suggesting for example that "deliberate indifference can also be inferred from the fact that a person was tased in their own home, without cause."  (Doc. 24 at 7.)  The adoption of such an inference would essentially lead to respondeat superior liability, rendering Monell and Harris meaningless.  Indeed, the Supreme Court has cautioned that the mere fact "[t]hat a particular officer may be unsatisfactorily trained will not suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  Harris, 489 U.S. at 390-91.  "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct," because "[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal."  Id. at 391.  As Plaintiffs failed to provide any evidence of a custom or practice of insufficient training or supervision, the Court finds Defendants are

entitled to summary judgment as to Plaintiffs' § 1983 claims against Colerain Township and all named Defendants in their official capacities.

> **2.** **Claims Against Colerain Township Trustees Keith N. Corman, Bernard A. Friedley, and Dianna Lynn Rielage, and Colerain Township Chief of Police Steven J. Sarver in Their Individual Capacities**

In addition to the official capacity claims, Plaintiffs also assert § 1983 claims against Colerain Township Trustees Keith N. Corman, Bernard A. Friedley, and Dianna Lynn Rielage, and Colerain Township Chief of Police Steven J. Sarver in their individual capacities.  As stated above, respondeat superior is not available as a theory of recovery under § 1983.  <u>Monell</u>, 436 U.S. at 691.  Accordingly, to hold a supervisory official liable under § 1983, "[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate."  <u>Bellamy v. Bradley</u>, 729 F.2d 416, 421 (6th Cir. 1984.)  Plaintiffs have made no showing that either the Trustees or Chief Sarver had any direct involvement with the arrests of George and Dawn Carter.  Instead, Plaintiffs contend that the supervisory Defendants are liable because they failed to fulfill an affirmative duty to train the defendant officers to interact with the public in a manner that is not harmful to the public.  Again, as described above, Plaintiffs offer absolutely no evidentiary support for this assertion.  Mere allegations will not suffice to demonstrate a genuine issue of material fact.  Accordingly, the Court grants summary judgment to the defendant trustees and Chief Sarver as to Plaintiffs' § 1983 claims.

> **3.** **Claims Against the Officers in their Individual Capacities**

16

Plaintiffs assert § 1983 claims against the defendant officers for false arrest and use of excessive force in violation of the Plaintiffs' Fourth and Fourteenth Amendment rights. Defendants move for summary judgment on the basis that Plaintiffs cannot show a genuine issue of material fact.  Additionally, Defendants argue they are entitled to qualified immunity.  Under the doctrine of qualified immunity, "'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Feathers v. Aey, 319 F.3d 843, 847 (6th Cir. 2003) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

When the defense of qualified immunity is raised in the context of a summary judgment, the plaintiff faces two hurdles.  Russo v. City of Cincinnati, 953 F.2d 1036, 1043 (6th Cir. 1992). First, the plaintiff must show that the facts alleged and the evidence produced, when viewed in a light most favorable to the plaintiff, show that the officer's conduct violated one or more of the plaintiff's constitutional rights.  See Saucier v. Katz, 533 U.S. 194, 201 (2001); Russo, 953 F.2d at 1043.  Next, the plaintiff must "allege facts sufficient to indicate that the act in question violated *clearly established law* at the time the act was committed." Russo, 953 F.2d at 1043; see also Saucier, 533 U.S. at 200.  If, at the first step, the court determines that "no constitutional right would have been violated were the allegations established" the inquiry ends.  Saucier, 533 U.S. at 201.  In other words, if the plaintiff cannot get past the first hurdle, the plaintiff's claim necessarily fails.

**a.     False Arrest**

Turning first to George and Dawn Carter's false arrest claims, the Court must examine whether the facts viewed in a light most favorable to Plaintiffs show that the officers lacked probable cause to arrest the Plaintiffs.  For Fourth Amendment purposes, an officer has probable cause to arrest an individual when the facts and circumstances within the officer's knowledge at the time of the arrest are sufficient to warrant a reasonable man in believing that the individual had committed or is committing an offense.  Wilson v. Morgan, Nos. 05-5615/5616, 2007 WL 268245, at *5 (6th Cir. Feb. 1, 2007).  "Probable cause is an issue of fact for the jury to resolve if there are any genuine issues of material fact that are relevant to the inquiry."  Swiecicki v. Delgado, 463 F.3d 489, 498 (6th Cir. 2006).  Plaintiffs have the burden of proving the absence of probable cause.  See St. John v. Hickey, 411 F.3d 762, 769 (6th Cir.2005).  In the event the facts demonstrate a constitutional violation has occurred, the Court must then determine whether the officers' actions violated clearly established law.

### i. George Carter

The defendant officers arrested George Carter for disorderly conduct and resisting arrest. To the extent that probable cause existed to arrest George Carter for either of those charges, the arrest was lawful for Fourth Amendment purposes.  See Swiecicki, 463 F.3d at 498.  Ohio Rev. Code § 2917.11, defining the offense of disorderly conduct, provides in relevant part:

> (A)    No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:
> (1)    Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior;
> (2)    Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person;
> (3)    Insulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response;

> (4)   Hindering or preventing the movement of persons on a public street, road, highway, or right-of-way, or to, from, within, or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender;
>
> (5)   Creating a condition that is physically offensive to persons or that presents a risk of physical harm to persons or property, by any act that serves no lawful and reasonable purpose of the offender.

Citing the following facts, Defendants argue that George Carter's conduct amounted to turbulent behavior: First, Defendants point to Officers Denney and Sevier's testimony that when they arrived, George Carter was outside and yelled "right here, bring your zappers." Defendants next point to Officer Denney's testimony that he believed Carter's neighbors heard Carter yelling. Finally, Defendants cite George Carter's behavior of running toward the officers with his fists balled as well as George Carter's statements to the officers that he was not going to prison and that they should just shoot him.

In their Response to Defendants' Motion for Summary Judgment, Plaintiffs devote only two paragraphs to their claims against the officers for false arrest and excessive force, arguing that "[i]t is unimaginable that an issue of material fact does not exist with regard to the False Arrest and Excessive Force claims."[9] Given the paucity of Plaintiffs' response, Plaintiffs' counsel must apparently expect the Court to rely on pure imagination. Despite Plaintiffs' failure

---

[9] One of Plaintiffs' main arguments is that "one cannot be disorderly in one's own home." (Doc. 24 at 5.) Plaintiffs cite no support for this assertion and Ohio case law suggests that a person can be arrested for disorderly conduct based on conduct that occurred in that person's home. See State v. Heffner, No. 16230, 1997 WL 309368, at *4 (Ohio Ct. App. June 6, 1997) (finding that because Ohio Rev. Code §§ 2917.11(A)(1) and (A)(5) "do not restrict where the violations may be committed," the plaintiff "could have properly been found guilty of disorderly conduct in her own home"); State v. Johnson, No. CA 14485, 1994 WL 718208, at *2-3 (Ohio Ct. App. Dec. 21, 1994) (upholding the defendant's conviction for disorderly conduct where the defendant was loud and belligerent and punched his fist into the wall, even though the defendant was in his own home at the time).

to cite any portion of the record supporting its claims, the Court's careful review of the deposition testimony submitted by Defendants reveals that Plaintiffs' testimony contradicts several of the Defendants' assertions. For instance, according to Plaintiffs, when Officers Denney and Sevier first arrived, George Carter's only comment to them was,  "I hope you all brought some plungers." Then, once the officers entered the house and George Carter told them to leave, Officer Denney approached George Carter with his taser drawn.  At that point, Plaintiffs claim George Carter did nothing more than back away with his hands raised above his head, telling Officer Denney to go ahead and shoot.  Shortly thereafter, Dawn Carter jumped in from of George Carter and Officer Denney shot both of them with his taser.

Ohio Courts have previously "held that a person may be found to have violated the disorderly conduct statute and engaged in "turbulent behavior" by confronting sheriff's deputies loudly and hostilely, and by failing to calm down when asked to do so." Carpenter v. City of Franklin, OH, No. 1:05-cv-323, 2006 WL 3791931, at *12 (S.D. Ohio Dec. 20, 2006) (citing Thacker v. Lawrence County, 182 F. App'x 464, 470 (6th Cir. 2006) and State v. Jackson, No. 17128, 1998 WL 801367, at *3 (Ohio Ct. App. Nov. 20, 1998)). Typically, acts such as ordering officers off of one's property and using vulgar language do not amount to disorderly conduct. See State v. Karle, 144 Ohio App. 3d 125, 133-134, 759 N.E.2d 815, 821-22 (Ohio Ct. App. 2001) (finding that "[a]lthough [the plaintiff] used language that would be considered offensive to most in ordering [the defendant officers] off his property, absent fighting words foul language alone does not give rise to disorderly conduct); Middletown v. Carpenter, No. CA2006-01-004, 2006 WL 1972061, at *3 (Ohio Ct. App. 2006).  To rise to the level of disorderly conduct, such acts typically must be accompanied by some form of aggressive behavior.  (See Carpenter, No.

20

CA2006-01-004, 2006 WL 1972061, at *3 (noting that "vulgar language, when accompanied by aggressive behavior, can be sufficient for a disorderly conduct conviction based on 'turbulent behavior'"); Jackson, No. 17128, 1998 WL 801367, at *4 (holding that the defendant engaged in "turbulent behavior" where, in addition to verbally berating officer, the defendant grabbed the officer's shirt)).

When viewed in a light most favorable to Plaintiffs the evidence in this case shows that the only thing the officers knew upon arrival was that they were dispatched to the house to investigate a possible domestic dispute and that once they got to the house George Carter became agitated, was shouting, and told the officers to leave his house. Officer Denney testified that he believed the Carters' neighbors could hear the noise; however, there is no evidence that any of the neighbors made complaints or were in any way bothered by the noise. See State v. Smith, 150 Ohio App. 3d 45, 779 N.E.2d 776 (Ohio Ct. App. 2002) (holding that the state failed to prove the elements of disorderly conduct where there was no testimony that the defendant's noise level inconvenienced anyone, including the officers, or caused any complaints). Moreover, there is no indication from Plaintiffs' testimony that George Carter was physically aggressive or threatening toward the officers.

The Sixth Circuit, interpreting Ohio Rev. Code § 2917.11, has found that absent physically aggressive behavior, the loudness and aggressiveness of one's speech can be sufficient to amount to turbulent behavior. See Thacker, 182 F. App'x at 470. Thus, in Thacker, the Sixth Circuit held that officers had probable cause to arrest an individual for disorderly conduct where that individual "(1) raised his voice, (2) swore at the deputies, (3) continued to swear at them after he was asked to calm down, and (4) was visibly upset." Id.; see also

21

Carpenter, No. 1:05-cv-323, 2006 WL 3791931, at *12.   However, the common string in such cases appears to be that the officers made some attempt to calm down the individual before making an arrest.  In the instant case, the evidence viewed in a light most favorable to Plaintiffs shows that the officers made no such attempt to calm George Carter down.  Instead, according to Plaintiffs, Officer Denney drew his taser almost immediately after entering the house and confronting George Carter.  Under these circumstances, Defendants lacked probable cause to arrest George Carter for disorderly conduct.

Defendants additionally arrested George Carter for resisting arrest.  Under Ohio law, "No person, recklessly or by force, shall resist or interfere with a *lawful* arrest of the person or another."  Ohio Rev. Code § 2921.33(A) (emphasis added).  An essential element of this statute is that there must be a lawful arrest un the underlying charge.  See State v. Raines, 124 Ohio App. 3d 430, 432, 706 N.E.2d 414, 415 (Ohio Ct. App. 1997); Swiecicki, 463 F.3d at 500. (discussing an analogous local ordinance).  The Court has already determined that questions of fact remain as to whether Defendants had probable cause to arrest George Carter for disorderly conduct.  Under Ohio law, the mere act of fleeing or backing away from an officer attempting to effect an unlawful arrest does not amount to resisting arrest.[10]  See State v. McCullough, 61 Ohio Misc. 2d 607, 610, 580 N.E.2d 1180, 1182 (Ohio Mun. Ct. 1990) (holding that the defendant's

---

[10] The Supreme Court of Ohio has abrogated an individual's common law right to resist an unlawful arrest by holding that one may not use *force* to resist an unlawful arrest except in instances where the officers use excessive or unnecessary force.  See Columbus v. Fraley, 41 Ohio St. 2d 173, 324 N.E.2d 735 (Ohio 1975) ("In the absence of excessive or unnecessary force by an arresting officer, a private citizen may not use force to resist arrest by one he knows, or has good reason to believe, is an authorized police officer engaged in the performance of his duties, whether or not the arrest is illegal under the circumstances.").  However, viewing the evidence in a light most favorable to Plaintiffs, there is no indication that George Carter used any force against the officers.

22

flight from an officer did not amount to resisting arrest where the officer lacked probable cause to arrest the defendant, regardless of whether or not the officer had reasonable suspicion); see also Raines, 124 Ohio App. 3d at 432, 706 N.E.2d at 415. Plaintiffs testified that none of the officers told George Carter he was under arrest until sometime after he was tased and that when Officer Denney confronted George Carter with his taser drawn, George Carter did nothing more than put his hands up, back away, and tell Officer Denney to go ahead and shoot him.  At most, Plaintiffs' testimony shows that George Carter backed away from an officer who neither told him he was under arrest nor had probable cause to make an arrest.  In light of these circumstances, the Court finds that questions of fact also remain as to whether the officers had probable cause to arrest George Carter for resisting arrest.  See Swiecicki, 463 F.3d at 500 (finding that the defendant officer was not entitled to qualified immunity as to the plaintiff's false arrest claim where the officer lacked probable cause to arrest the plaintiff for disorderly conduct and therefore also lacked probable cause to arrest the plaintiff for resisting arrest).

    Defendants finally argue that they had probable cause to arrest George Carter for menacing, pursuant to Ohio Rev. Code § 2903.22(A), which provides in relevant part that "[n]o person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person."  Defendants base this argument largely on the officers' testimony that George Carter charged up the stairs toward them with his fists balled.  However, as discussed above, Plaintiffs deny that allegation.  Thus, there remain questions of fact as to whether the officers had probable cause to arrest George Carter for menacing.

    Having found genuine issues of material fact remain as to whether the officers had probable cause to arrest George Carter, the Court must now determine whether the right to be

free from arrest without probable cause is clearly established.  Indeed, an abundance of prior

case law affirms that it is.  See Swiecicki, 463 F.3d at 500 (finding that the plaintiff's Fourth

Amendment right to be free from an arrest without probable cause was clearly established at the

time of his 2001 arrest for disorderly conduct and resisting arrest); Jernigan v. City of Royal

Oak, 202 F. App'x 892, 897 (6th Cir. 2006) ("[B]ecause it is clearly established that officers

need probable cause before arresting an individual and searching him, we cannot grant qualified

immunity based on the second Saucier inquiry."); St. John, 411 F.3d at 770-71 (holding that the

defendant officers were not entitled to qualified immunity as to the plaintiff's claim of false

arrest for disorderly conduct where questions of fact remained as to whether the officers had

probable cause and the right to be free from arrest without probable cause is clearly established);

Donovan v. Thames, 105 F.3d 291, 298 (6th Cir. 1997) (citing Beck v. Ohio, 379 U.S. 89, 90-91

(1964)).  Accordingly, Defendants are not entitled to qualified immunity on George Carter's

false arrest claim.

### ii.    Dawn Carter

For many of the same reasons as stated above, neither are Defendants entitled to qualified

immunity on Dawn Carter's false arrest claim.  Defendants claim they had probable cause to

arrest Dawn Carter for obstructing official business and resisting arrest.  An individual may be

arrested for obstructing official business under Ohio Rev. Code § 2921.31(A) where that

individual commits "any act that hampers or impedes a public official in the performance of the

public official's lawful duties . . . without privilege to do so and with purpose to prevent,

obstruct, or delay the performance by a public official of any authorized act within the public

official's official capacity."

Dawn Carter admits to jumping in front of George Carter with the purpose of blocking Officer Denney's access to George Carter.  However, just as with Ohio's resisting arrest statute, § 2921.31(A) requires that an individual interfere with a public official's *lawful* duties in order for the interference to amount to obstruction of justice.  As described above, there remain several genuine questions of material fact suggesting that the officers' attempted arrest of George Carter was not supported by probable cause and therefore was not lawful.  Accordingly, questions of fact preclude the Court from holding that the officers, as a matter of law, had probable cause to arrest Dawn Carter for obstruction of official justice.  The same questions of fact additionally preclude the Court from holding that the officers had probable cause to arrest Dawn Carter for resisting arrest.

Finally, as the right to be free from arrest without probable cause is clearly established, the defendant officers are not entitled to qualified immunity as to Dawn Carter's arrest.

### b. Excessive Force

George and Dawn Carter additionally argue that the officers used excessive force in effectuating their arrests.  "The use of excessive or unreasonable force by police officers in the exercise of their authority gives rise to a § 1983 cause of action."  <u>Russo</u>, 953 F.2d at 1044. Again, in determining whether the defendant officers are entitled to qualified immunity, the Court must first determine whether the facts viewed in the light most favorable to Plaintiffs show that a constitutional violation has occurred. <u>See</u> <u>Feathers</u>, 319 F.3d at 848. The question of whether an officer used excessive force is analyzed under an objective reasonableness standard, requiring this Court to consider whether the force used to subdue George and Dawn Carter was

25

reasonable from the perspective of a prudent officer on the scene. See Greene v. Barber, 310

F.3d 889, 898-99 (6th Cir. 2002).

In determining whether Officer Denney used unreasonable force against George and

Dawn Carter, the Court considers the following factors: (1) the severity of the crime at issue; (2)

whether George or Dawn Carter posed an immediate threat to the safety of the officers or others;

and (3) whether they were actively resisting arrest or attempting to evade arrest by flight. Russo,

953 F.2d at 1044. Beginning with George Carter, his alleged crimes of disorderly conduct and

resisting arrest were not severe. This is particularly so in light of the fact that according to

Plaintiffs, George Carter did little more than loudly tell the officers to get out of his house before

Officer Denney drew his taser. As to the second factor, there is no indication that George Carter

posed a threat to the officers or to anyone else in the house. Finally, there is no indication that

George Carter used force to resist the officers or that he made any attempt to flee. Instead, as

stated above, Plaintiffs testified that once Officer Denney drew his taser, George Carter merely

backed away from the officer with his hands up and told him to go ahead and shoot. Even if

Officer Denney interpreted Carter's behavior as hostile, any potential threat was lessened by the

fact that Officer Denney was not alone, but had two other officers with him, either one of which

may have been able to secure George Carter while Officer Denney continued to point the taser at

him. Under these circumstances, it is questionable whether it was reasonable for Officer Denney

to even draw his taser in the first place, let alone whether it was reasonable for him to ultimately

stun George Carter. See Russo, 953 F.2d at 1044 (suggesting even that the use of a taser against

an *armed* individual may be unreasonable where enough officers may be called to the scene to

subdue the individual without resorting to use of the taser).

26

There exist a multitude of cases in which courts have held that the use of non-deadly force, such as pepper-spray or a taser, to subdue a defendant who is armed or who poses an immediate threat does not amount to excessive force. See, e.g., Gaddis ex rel. Gaddis v. Redford Tp., 364 F.3d 763, 774-75 (6th Cir. 2006) (holding that the officer's use of pepper spray against an armed suspect who was resisting arrest was reasonable). In this case, however, George Carter was unarmed and, as stated above, does not appear to have posed an immediate threat to either the officers or anyone else in the house. Of course, the Court recognizes the reality that almost any confrontation involving the police has the potential to erupt in violence. Indeed, the Supreme Court has cautioned that when inquiring into the reasonableness of an officer's actions, courts must keep in mind the fact "that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 397 (1989). However, this Court is equally mindful that in some situations those "tense, uncertain, and rapidly evolving" circumstances may have resulted from the officer's own unreasonable reaction to a relatively routine situation.

The analysis yields a similar conclusion with regard to Officer Denney's use of the taser against Dawn Carter. Officer Denney testified that he stunned Dawn Carter because she became violent and hit him. However, Plaintiffs deny this allegation, and instead testified that Officer Denney jumped around Dawn Carter to stun her brother, knocking furniture over in the process, and then mere seconds later stunned her. Plaintiffs also testified that Officer Denney stunned Dawn Carter not just once, but multiple times, first stunning her several times without a cartridge after she had already fallen to the ground and then backing away and shooting her with a

cartridge.  If the facts are as Plaintiffs allege, Officer Denney's use of force against Dawn Carter appears to have been patently unreasonable.

As for the other officers, Plaintiffs neither allege nor point to any facts showing that Officers Hussel or Sevier used any force against George or Dawn Carter.  Nonetheless, "it is not necessary, in order to hold a police officer liable under [§] 1983, to demonstrate that the officer actively participated in [using force against] a plaintiff." Bruner v. Dunaway, 684 F.2d 422, 426 (6th Cir. 1982).  In fact, "[l]aw enforcement officials have a duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers." Kaylor v. Rankin, 356 F. Supp. 2d 839, 850 (N.D. Ohio 2005).  Accordingly, an officer who fails to intervene "is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." Jacobs v. Village of Ottawa Hills, 5 F. App'x 390, 395 (6th Cir. 2001) (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted)).  In the instant case, the officers' deposition testimony indicates that both Officer Sevier and Officer Hussel were present when Officer Denney tased George and Dawn Carter. Questions of fact remain as to whether Officers Sevier and Hussel had "a realistic opportunity to intervene to prevent the harm from occurring," as is required for liability to attach. Anderson, 17 F.3d at 557; see also Kaylor, 356 F. Supp. 2d at 850 ("Generally the issue of whether an officer had sufficient time to intervene or was capable of preventing the harm is a question of fact for the jury . . ..").

Having found that questions of fact remain as to whether the defendant officers used excessive force against George and Dawn Carter, the Court must next determine whether

28

Plaintiffs have alleged sufficient facts showing that officers' actions violated clearly established law.  See Russo, 953 F.2d at 1043.  In making this determination, the Court is mindful that "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  Hope v. Pelzer, 536 U.S. 730, 741 (2002); see also Caldwell v. Moore,  968 F.2d 595, 599 (6th Cir. 1992) ("The particular circumstances of the given case need not have been previously held illegal for the right to be 'clearly established,' but the right must be defined in a manner that puts a reasonable official on notice that his actions are illegal or unconstitutional.").

Generally speaking, individuals have a clearly established right to be free from the unreasonable use of non-lethal force.  Defendants cite Russo, 953 F.2d at 1044-45, for the proposition that the use of a taser in order to obviate the need for greater force does not violate clearly established law.  However, Russo involved a situation in which officers were faced with a potentially homicidal and suicidal suspect, armed with two knives, who had made threatening remarks to the officers.  Russo, therefore, is not controlling in this case.  Indeed, courts have found that under certain circumstances, such as where the suspect did not pose the level of threat described in Russo, the unreasonable use of a taser to subdue the suspect violates the suspect's clearly established right to be free from excessive force.  Belford v. City of Akron, No. 5:05cv2650, 2006 WL 2381507, at *5 (N.D. Ohio Aug. 16, 2006).  For example, in Belford, the United States Court for the Northern District of Ohio held that the defendant officers were not entitled to qualified immunity as to the plaintiff's excessive force claim where the officers kneed and tased an unarmed suspect after they had already brought him to the ground, despite the fact that the suspect had originally resisted arrest.  Id.; see also Harris v. County of King, No. C05-1121C, 2006 WL 2711769, at *3 (W.D. Wash. Sept. 21, 2006) (holding that it is "clearly established that a police officer may not use a taser gun on an arrestee to effectuate an arrest

when the arrestee is complying with the officer's orders and when the suspect has already turned around and put his hands over his head at the direction of the officer").

On a broader level, courts have also found that it is clearly established that the use of non-lethal force against an individual who is not actively resisting the officer and who does not pose an immediate threat is excessive.  See Ciminillo v. Streicher, 434 F.3d 461, 468-69 (6th Cir. 2006) (refusing to grant qualified immunity to the defendant officer with respect to the plaintiff's excessive force claim because the officer was "on notice that it is unreasonable to use beanbag propellants against individuals who pose no immediate risk to officer safety"; Adams v. Metiva, 31 F.3d 375, 385-86 (6th Cir. 1994) (denying summary judgment to the defendant officers with regard to the plaintiff's claim that the officers' use of pepper-spray against the plaintiff amounted to excessive force, when it remained disputed whether the plaintiff had committed a crime, whether he posed a threat, and whether he was resisting arrest).

According to Plaintiffs, George and Dawn Carter were not actively resisting the officers, were not told that they were under arrest, were unarmed and did not pose an immediate threat to the officers.  Moreover, if the facts of this case are as Plaintiffs allege, Defendants lacked probable cause to arrest Plaintiffs in the first place.  The Court finds as a matter of law that it was clearly established that the use of a taser against Plaintiffs under these circumstances would constitute excessive force.  Therefore, Defendants are not entitled to qualified immunity.

### C.    Section 1985 Conspiracy Claim

To the extent that Plaintiffs' complaint states a conspiracy claim under 42 U.S.C. § 1985(3),[11] Defendants move for summary judgment on the basis that Plaintiffs fail to allege and

---

[11] It is questionable whether Plaintiffs' complaint actually states a claim under § 1985(3). Nonetheless, because Defendants briefed this issue, the Court will address it herein.

cannot prove any class-based discrimination. To establish a conspiracy claim, Plaintiffs must prove:

> (1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.

Johnson v. Hills & Dales Gen. Hosp., 40 F.3d 837, 839 (6th Cir .1994). They must also prove that the conspiracy was motivated by class-based animus. Farmer v. City of Cincinnati, No. 1:04-CV-080, 2006 WL 3762131, at *5 (S.D. Ohio Dec. 21, 2006). Indeed, Plaintiffs neither allege nor point to any evidence that they are part of a class of individuals or that Defendants engaged in a conspiracy for the purpose of depriving that class of equal protection of the laws. In fact, Plaintiffs completely ignored this issue in their Response to Defendants' Motion for Summary Judgment. Therefore, Plaintiffs' § 1985 conspiracy claim fails as a matter of law.

> **D.     State Law Claims**

Finally, the Court turns to Plaintiffs' remaining state law claims for assault, battery, and negligence. Defendants move for summary judgment as to all state law claims on statutory immunity grounds. Ohio Rev. Code § 2744.02(A)(1) provides that "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." There are certain exceptions to this broad grant of immunity, as specifically described in § 2744.02(B); however, none apply to the instant case. As to Plaintiffs' claims against the individual defendants, Ohio Rev. Code § 2733.03(A)(6) extends this immunity to all employees of a political subdivision unless one of the following exceptions applies:

31

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;
(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

Again, Plaintiffs do not argue that any of the exceptions to immunity apply in this case. Instead, Plaintiffs argue only that Ohio Rev. Code §§ 2744.02 and 2744.03 violate Article I, Section 5 and Article I, Section 16 of the Ohio Constitution. Contrary to Plaintiffs' assertion, the Sixth Circuit has recently held that these statutes do not violate the Ohio Constitution. Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 697 (6th Cir. 2006) ("The district court properly held that the Liability Act, Ohio Rev. Code §§ 2744.02, 2744.03, does not violate article I, sections 5 and 16, of the Ohio [C]onstitution because the Supreme Court of Ohio has never held the statute unconstitutional and because Ohio's intermediate courts are unanimous in upholding the statute." Accordingly, the Court finds that Defendants are entitled to statutory immunity as to Plaintiffs' state law claims.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to strike and **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment. Specifically, the Court grants summary judgment to Defendants as to all of Plaintiffs' claims except for George and Dawn Carter's § 1983 excessive force and false arrest claims against Officers Denney, Sevier, and Hussel in their individual capacities.

IT IS SO ORDERED.

___s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge

33